UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-10645-GAO

JESUS RAMOS,
Plaintiff,

v.

FORMER SHERIFF OF WORCESTER COUNTY JOHN M. FLYNN, THOMAS R.
PATNAUDE, M.D., WORCESTER INTERNAL MEDICINE, INC., PAMELA DEYETTE,
L.P.N., JEAN WILSON, L.P.N., ROXANN BURGWINKEL, L.P.N., KERI POULIN, L.P.N,
EMILY COURNOYER, R.N., JANE DOE, R.N., C.O. CHRIS LARAMEE, C.O. TODD HILL,
DONALD CORKRAN, L.P.N., C.O. JOHN DOE, CORRECTIONAL SUPERVISOR JOHN
DOE, C.O., and F/N/U HRT,
Defendants.

OPINION AND ORDER
July 22, 2009

O'TOOLE, D.J.

## I.  Background

The plaintiff, Jesus Ramos, alleges that while incarcerated as a pre-trial detainee at the

Worcester County House of Correction ("WCHC") in April 2003, his rights under the Due Process

Clause of the Fourteenth Amendment were violated. His amended complaint alleges, broadly, that

between April 5, 2003 and April 13, 2003 he experienced a severe drug withdrawal reaction, and

that as a result of inappropriate medical care his health deteriorated to the point where he had to be

admitted to Saint Vincent Hospital. He was diagnosed with extreme dehydration, acute renal

failure, advanced respiratory distress, subcutaneous emphysema, mediastinal emphysema,

presumed esophageal perforation, malnourishment, metabolic alkalosis, hypokalemia, and

pneumothorax of the right chest and total collapse of the right lung. Exploratory surgery left him

with a lengthy and visible scar.

In addition to his constitutional claim brought pursuant to 42 U.S.C. § 1983, Ramos also alleges the tort of intentional infliction of emotional distress under Massachusetts law.

The defendants are numerous. Pertinent to this Opinion and Order are five defendants who have moved for summary judgment: the former Sheriff of Worcester County, John M. Flynn, Worcester Internal Medicine, Inc., Ramos's treating physician at the WCHC, Dr. Thomas R. Patnaude, and Corrections Officers Chris Laramee and Todd Hill.

The moving defendants argue that they are entitled to summary judgment on the merits of all claims brought against them because Ramos has not demonstrated that he has admissible evidence which would permit a rational jury to infer that any of the defendants were deliberately indifferent to a substantial risk of serious harm to Ramos or that they committed the tort of intentional infliction of emotional distress. They also argue that Ramos's claims must be dismissed because he failed to exhaust administrative remedies prior to initiating this suit as required by federal and state law, and because they are entitled to qualified immunity.

## II.    **Summary Judgment Standard**

Summary judgment serves "to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for trial." Johnson v. Gordon, 409 F.3d 12, 16–17 (1st Cir. 2005) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). A party should be granted summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The movant must put the ball in play, averring 'an absence of evidence to support the nonmoving party's case.'" Garside, 895 F.2d at 48 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Pursuant to the Local Rules of this Court, a party moving for summary judgment must "include a concise statement of the material

2

facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." LR 56.1.

"When the nonmovant bears the ultimate burden of proof on a given issue, he must make a factual showing, by means of competent and specific evidence, sufficient to establish the essential elements of his claim." Johnson, 409 F.3d at 17 (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). The nonmovant "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). And, like the movant, the opposing party is required by the local rules to submit its own statement of material facts as to which it contends a genuine fact dispute exists. See LR 56.1. Facts proffered by a party in a Local Rule 56.1 Statement and not opposed by the other side may be deemed admitted. See, e.g., Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003).

The summary judgment record is viewed in the light most favorable to the non-moving party, and all reasonable inferences are drawn in that party's favor, see Mariani-Colon v. Dep't of Homeland Sec. ex. rel. Chertoff, 511 F.3d 216, 221 (1st Cir. 2007), but if a party wishes the Court to consider evidence in support of its claim, it must be referenced in its Local Rule 56.1 Statement. The Court is not required to sift through the summary judgment record to marshal evidence in support of a party's claims or arguments. This is particularly important in a case such as this, where much of the evidence is in the form of substantially illegible medical records.[1]

---

[1] I also note that much of Ramos's factual proffer in the summary judgment record comes in the form of unauthenticated documents. For one example, an exhibit referred to as the Bianchi Affidavit is actually just an expert report without, so far as I can find, any accompanying affidavit to authenticate it. (See Ex.List to Pl. Jesus Ramos's Opp'n to Summ. J. Mot. of Def. Patnaude Ex. Bianchi Aff.) "'To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" Carmona

## III.    Summary of the Facts

When Ramos was incarcerated at the WCHC beginning on April 4, 2003, he was addicted to heroin. On April 5, he was seen by Dr. Patnaude, who started Ramos on a detoxification protocol of medications for opiate withdrawal.[2] Ramos experienced vomiting and diarrhea, and on April 10 he was examined by Dr. Patnaude. Ramos complained of numbness in his whole body, hyperventilation, and incontinence. Notwithstanding Ramos's complaints about his symptoms, Dr. Patnaude kept Ramos on the same drug detox protocol for three more days. Dr. Patnaude also requested blood work—specifically a complete blood count ("CBC"), and testing for blood urea nitrogen levels and electrolytes. He did not order that the test be expedited, and Ramos's blood was not drawn until the next day, April 11.

Ramos continued to have vomiting and diarrhea. Jail progress notes from 2:50 a.m. on April 12 reflect that he had claimed to be bleeding, and was found lying on the floor with his blanket missing. The progress notes further state that no bleeding was noted, but that Ramos was

---

v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (quoting Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993)); see Fed. R. Civ. P. 56(e). However, the defendants have not objected to, nor moved to strike, any of these documents, and even taking them into consideration, insofar as they are referenced in the parties' statements of material facts, the plaintiff's claims come up well short of surviving summary judgment.

[2] The parties' several statements of material facts do not explain what drugs were included in the detox protocol. The amended complaint alleges that he was put on "a regimen of oral medications, consisting of Compazine, Donnatol, and Tranxene." (First Am. Compl. ¶ 51.)

4

> incontinent of urine and had vomited large amts. of brown tinged emesis. Unable to sit [because of] vertigo. Unable to obtain Pulse Ox 2° syonosis [sic] of both hands, BP 90/P (L)arm, P 100 R 16, skin cool and clammy, (R) eye noted to have a mod. amt. of purulent drnge, and responded [with] eye contact when he was asked to look @ this writer but remained non-verbal.

(Pl.'s Mem. Opposing Defs.' Mot. for Summ. J. on the First Am. Compl. Ex. 19 at 6 [hereinafter Pl.'s Mem.].)

An ambulance was summoned to take him to the Saint Vincent Hospital emergency room. EMT records and deposition testimony reflect that Ramos's vital signs were abnormal (he was hypotensive), that his cell was completely covered with vomitus, and that his radial pulse was "thready," and "difficult to palpate," which was "an indication of some vasal constriction." (Id. Ex. 22 at 18.) The EMT found Ramos to be ill and very weak. Ramos arrived at the emergency room at 3:57 a.m. He was seen by a nurse and two physicians and given intravenous hydration.

Shortly after his arrival at the emergency room, Ramos appeared lethargic and vomited green bile. He vomited a second time at 5:45 a.m. When Ramos was later discharged from the hospital, the attending physicians had formed the clinical impression that he was experiencing vomiting and diarrhea as a result of opioid withdrawal. At his deposition, Ramos stated that C.O. Laramee, not the medical staff at the hospital, was responsible for his discharge, because "[f]or some reason, [Laramee and another officer] had to go back to jail or go home." (See Pl.'s Mem. Ex. 28 at 117–18.)

The results of the blood work ordered by Dr. Patnaude on April 10 had been faxed to the jail only minutes before the ambulance left the jail to take Ramos to the emergency room, but the results were not discovered by the jail's medical staff until the next day. The results showed Ramos's CBC and electrolyte panel were abnormal and demonstrated that he was profoundly dehydrated. One of the emergency room attending physicians later testified at his deposition that had these results been available to him, he would have continued to provide Ramos with intravenous hydration, called Dr.

Patnaude, and likely admitted Ramos to the hospital. Instead, Ramos was discharged and returned to

the WCHC.

On April 13, a nurse observed Ramos lying on the floor of his cell, incontinent and vomiting

a brown foamy material. Paramedics arrived and also observed him in his cell, lying in feces. He was

sent back to the emergency room and was admitted to the hospital. The hospital's transfer summary

states:

> On physical examination, he is afebrile with normal and stable vital signs. His
> cardiopulmonary examination is within normal limits as is his abdominal
> examination. His laboratory values note a white blood cell count of 13.2 and an
> elevated creatinine up to 4.6. His potassium level was 2.5 with an elevated
> bicarbonate of 48. These clinical findings were consistent with acute renal failure
> secondary to dehydration and was subsequently admitted to the medical service for
> aggressive fluid resuscitation. Consultation was obtained by the Department of Renal
> Medicine who had felt his metabolic alkalosis was likely secondary to his persistent
> vomiting as was his hypokalemia. He was subsequently admitted to the Intensive
> Care Unit primarily because of his poor mental status in light of his presumed heroine
> [sic] withdrawal in addition to his severe electrolyte abnormalities.
> Hemodynamically he was stable during this time. Nasogastric tube was placed which
> drained brown succulent material in light of his persistent succulent vomiting. During
> his hospital stay, he was found to have a presumed esophageal perforation in light of
> his persistent retching and vomiting for which thoracic consultation was obtained. A
> chest x-ray with subcutaneous emphysema, pneumopericardium was noted which
> prompted a thought process that an eosphageal [sic] rupture may have taken place
> especially in light of his persistent vomiting. He was subsequently taken to the
> Operating Room on 4/14/03 where he underwent a right thoracotomy and
> mediastinal exploration. Intraoperatively there was no area that could be identified
> that had an exact perforation. The area was drained with mediastinal chest tubes and
> transferred to the Intensive Care Unit postoperatively. He continued to have some
> renal dysfunction which appeared to slowly resolve with improving hydration. He
> was subsequently transferred to the floor and eventually underwent a gastrografin
> swallow on 4/21/03 in which no leak was noted from his esophagus. As such, his
> nasogastric tube was removed and sips of clears were started. His chest tubes were
> removed over the ensuing days and he was subsequently discharged from the hospital
> on 4/23/03.
>
> Summary of final diagnosis for this admission:
> 1. Esophageal perforation.
> 2. Thoracotomy and mediastinal exploration with no obvious site of
> perforation

3.    Metabolic disorder secondary to dehydration.
4.    Hypokalemia.
5.    Acute renal failure.
6.    Heroine [sic] withdrawal.

(Id. Ex. 19 at 44–45.) As a result of the surgery, Ramos was left with a visible scar on his thorax, running approximately from his breastbone to the center of his back.

## IV.    § 1983 Claims

Because Ramos was a pre-trial detainee, his § 1983 claims are grounded in the Due Process Clause of the Fourteenth Amendment, rather than in the Eighth Amendment's proscription of cruel and unusual punishment, though the analysis is the same. See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).[3] Under both constitutional provisions, the government is obliged to provide medical care for those it incarcerates. Estelle v. Gamble, 429 U.S. 97, 103 (1976); see DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.").

However, "[f]or medical treatment in prison to offend the Constitution, the care 'must involve acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007) (internal quotations and citation omitted). This "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with 'actual knowledge of impending harm, easily preventable.'" Id.

---

[3] The Eighth Amendment applies only when there has been a formal adjudication of guilt. City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983); Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 9 (1st Cir. 2007).

7

(quoting Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 162 (1st Cir. 2006)). To establish liability under § 1983 the plaintiff must show that a prison official was subjectively aware of, yet failed to attend to, his objectively serious medical needs. See Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994); Estelle, 429 U.S. at 104–05.

"Deliberate indifference" is a state-of-mind requirement that goes beyond negligence. See Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). It is insufficient to prove only that a prison official *should* have known of an excessive risk to an inmate's health because a reasonable person would have: "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." Farmer, 511 U.S. at 837 (emphasis added).

Even if prison officials are aware of a serious risk, "they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." Burrell, 307 F.3d at 8 (citing Farmer, 511 U.S. at 844). Disagreements about the appropriate course of medical treatment do not rise to a level of constitutional significance unless the care received is "'so clearly inadequate as to amount to a refusal to provide essential care.'" Toracco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (quoting Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985)). "The care provided must have been 'so inadequate as to shock the conscience.'" Feeney, 464 F.3d at 162 (quoting Torraco, 923 F.2d at 235). "'[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981) (quoting Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

In addition to liability under § 1983 as a direct participant, a prison official may also be liable as a supervisor under § 1983. However, respondeat superior is not an available theory of such liability; instead liability must be based on a supervisor's own acts or omissions. See Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005). The supervisor must have condoned or tacitly authorized his subordinates' unconstitutional conduct. Id. The supervisor's action (or inaction) must be "'*affirmatively link[ed]*'" to the unconstitutional conduct, such that it "could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence . . . amounting to deliberate indifference.'" Id. (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1379–80 (1st Cir. 1995)).

Ramos alleges that the defendants were aware that he was in serious need of medical attention, but were deliberately indifferent in failing to provide him with adequate medical care. In moving for summary judgment, the defendants argue that the plaintiff lacks evidence to support this claim. I agree.[4] In opposing the several motions, Ramos has not put forth evidence that could sustain a rational jury's verdict in his favor on his § 1983 claims against any of the moving defendants. See Torraco, 923 F.2d at 234 ("A state-of-mind issue such as the existence of deliberate indifference usually presents a jury question. However, where there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional, or evidence of acts or omissions so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate.") (internal citations and quotations omitted).

---

[4] Because no constitutional violation has been shown, it is not necessary to discuss qualified immunity, though I note that the right involved is clearly established.

A.    Sheriff Flynn

It is hard to understand exactly what Ramos's claim against former Sheriff Flynn is. Though Ramos denies that it is a respondeat superior claim, there is nothing in his Local Rule 56.1 Statements that addresses actions or omissions by Flynn personally. The claim seems to rest on the fact that Flynn was in charge of the Sheriff's Department. It is not clear whether the plaintiff claims that the detox protocols were Flynn's responsibility and that the proper execution of deficient protocols amounted to deliberate indifference or, alternatively, whether it is that while the protocols may have been good, they were ignored, and the failure to follow them amounted to deliberate indifference. In either event, the claim against Flynn would apparently be that he defaulted in his supervisory responsibilities, either to (a) have good protocols, or (b) see that protocols that were good were followed.

Either way, Ramos's § 1983 claims against Flynn fail because there is no evidence that Flynn actually knew that Ramos (or any other inmate) was at risk. Without direct evidence of Flynn's awareness of any facts related to Ramos's condition nor of any defects in the protocols, Ramos instead argues that Flynn's actual knowledge may be inferred from the obviousness of the risk to detoxing inmates categorically:

> Here, Ramos asserts that Sheriff Flynn does not need to have knowledge of every decision or treatment in order to be liable. The Sheriff was the policymaker at the WCHC. Flynn knew or should have known that inmates who were detoxing would be forced to do so outside of an infirmary setting and instead be forced to detox in "medical watch."

(Pl.'s Mem. 7.) It is true that a prison official's actual knowledge can be proven by circumstantial evidence and that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," Farmer, 511 U.S. at 842, but that does not mean that the "deliberate indifference" standard should creep closer to negligence at summary judgment: Ramos

10

must put forth evidence that would support a rational jury's conclusion that Flynn had actual subjective appreciation of the risk to Ramos.

Ramos does not explain why the risk of serious harm to him was obvious, nor why it was obvious *to Flynn*. See Ruiz-Rosa, 485 F.3d at 157 (stating that for a factfinder to infer actual knowledge from the obviousness of the risk, "[t]he risk . . . must have been obvious to the particular officials who are defendants."). It is undisputed that the facility is accredited by the National Commission on Correctional Health Care. Even if (contrary to the implication from accreditation) Ramos's experts were to offer an opinion that the detox policies were substandard, that does not speak to Flynn's subjective awareness of the deficiency.

Ramos has himself offered evidence that Dr. Patnaude believed that detoxing inmates have suffered dangerous complications requiring hospitalization fewer than ten times each year, and Ramos admits that it "may be true" that "complications experienced by detoxing pre-trial detainees/sentenced inmates are the historical exception and not the norm." (Pl. Jesus Ramos's Resp. to Concise Statement of Material Facts of Def. Thomas R. Patnaude, M.D. and Pl.'s Statement of Additional Material Contested Facts ¶ 14.) A proposition—here, that detoxing inmates are categorically at a substantial risk of serious harm when detoxing in a jail—is certainly not an obvious one when the plaintiff acknowledges that the opposite of that proposition "may be true."

## B.   Correctional Officer Hill

The plaintiff's Local Rule 56.1 Statements are almost entirely without mention of Correctional Officer Hill. The only references are the rather innocuous undisputed facts that on April 11, 2003, he worked from 3:00 p.m. until 11:00 p.m., was stationed in the unit of the jail in which Ramos was housed from 3:00 p.m. to 5:00 p.m., and escorted Ramos to the jail's medical area to be seen by a nurse at 9:10 p.m. Significantly, the section of the plaintiff's brief entitled "Contrary to

11

Defendants' Arguments, There are Sufficient Facts in the Record to Warrant Holding Flynn, Hill, and Laramee Accountable on the Deliberate Indifference Claim . . . ." does not actually mention Hill at all. (See Pl.'s Mem. 6–12.)

Hill's name appears only later in the brief, within a discussion of qualified immunity. (See id. at 13.) Ramos refers to an allegation in his amended complaint that "Hill was deliberately indifferent to the serious medical needs of Ramos by refusing to summon medical help or to provide a clean blanket necessary for cleanliness and to maintain his body temperature," (id. (quoting First Am. Compl. ¶ 89)), but an allegation in the complaint plainly cannot be used to defeat a summary judgment motion. See Fed. R. Civ. P. 56(e)(2); Ruiz-Rosa, 485 F.3d at 156. Ramos cites his own testimony from his deposition stating generally (without any specific mention of Hill) that he had told his family that he had been treated poorly at the jail because he was sick and "'was completely ignored.'" (Pl.'s Mem. 13 (quoting Pl.'s Mem. Ex. 28 at 23–24).) On this evidence, Hill is clearly entitled to summary judgment on the deliberate indifference claim.

## C.   Correctional Officer Laramee

Discussion of Correctional Officer Laramee is similarly absent in the deliberate indifference section of Ramos's brief. In the response to the defendants' asserted undisputed fact that there was no evidence to support Ramos's allegation that Laramee caused his care at the emergency room to be terminated prematurely, (see Defs.' Concise Statement of Material Facts in Supp. of Their Mot. for Summ. J. ¶ 32), Ramos denied this assertion and cited a portion of his deposition in which he said that Laramee and another officer, rather than the medical staff at the hospital, were responsible for his discharge, because "[f]or some reason, they had to go back to jail or go home." (See Pl.'s Mem. Ex. 28 at 117–18.)

Even assuming that a rational jury could find on the basis of this vague statement that

12

Laramee had asked the doctors to discharge Ramos for reasons related to his own convenience, the fact is insufficient to sustain a claim of harm by deliberate indifference. It is hardly remarkable that someone in a hospital emergency room might express a desire to leave in order to be someplace else. Such a statement might often be made in order to speed things up, or simply to express frustration at the very fact of being in a hospital, but in any event it certainly does not inherently imply a desire that a doctor should forego providing adequate care. Beyond that, of course, is the complete absence of evidence that hospital personnel responsible for authorizing the discharge were influenced by the statement and discharged Ramos against their own medical judgment, or that Laramee was actually aware that discharging Ramos at that point would put him at substantial risk of serious harm. Accordingly, Laramee is entitled to summary judgment on this claim. See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . . [A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference.").

### D. Dr. Patnaude

Ramos's § 1983 evidence with respect to his claim against Dr. Patnaude similarly fails to satisfy the deliberate indifference standard. The claimed misconduct by Dr. Patnaude falls into three general areas: (1) the detox protocol was inappropriate in itself;(2) Dr. Patnaude continued Ramos on the same protocol even though it was simply not working, as Ramos continued to become dehydrated; and (3) Dr. Patnaude should have ordered the test of Ramos's blood to be done immediately so that the results would have been promptly available. The soundness and prudence of Dr. Patnaude's judgment can certainly be questioned on this record, but aside from whether any of

13

the cited actions or omissions fell below the appropriate standard of care so as to constitute negligence or medical malpractice, there is not sufficient evidence that Dr. Patnaude acted, or failed to act, out of deliberate indifference to Ramos's medical needs.

Ramos's expert strongly criticizes Dr. Patnaude's medical decisions, even to the point of calling them "reckless." (See, e.g., Ex. List to Pl. Jesus Ramos's Opp'n to Summ. J. Mot. of Def. Patnaude Ex. Wartenberg Aff. 8.) "Reckless" is a word with some "deliberate indifference" resonance. But merely invoking the word is not a substitute for evidence of "deliberate indifference." Ramos's expert cannot create a genuine issue of fact as to "deliberate indifference" simply by using the word "reckless." The necessary legal standard must be met. The First Circuit summarized that standard in Ruiz-Rosa:

> Deliberate indifference . . . may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable." Deliberate indifference means that "a prison official subjectively must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Therefore, substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation.

485 F.3d at 156 (internal citations and quotations omitted).

Ramos may have a case for substandard care, but his evidence falls short of showing that Dr. Patnaude was aware that his treatment (or lack of it) of Ramos was presenting a substantial risk to him and that he nonetheless persisted, realizing that serious harm was likely See id. at 157 ("Although Ruiz disagrees with the treatment Dr. Pichardo provided, Dr. Ramirez's opinion does not provide evidence that Dr. Pichardo was aware that the antibiotic he prescribed was ineffective and would pose a substantial risk of harm to Machuca."). It is tort law, and not § 1983, that provides a remedy in such a situation. See Daniels v. Williams, 474 U.S. 327, 333 (1986) ("That injuries

14

inflicted by governmental negligence are not addressed by the United States Constitution is not to say that they may not raise significant legal concerns and lead to the creation of protectible legal interests. The enactment of tort claim statutes, for example, reflects the view that injuries caused by such negligence should generally be redressed. It is no reflection on either the breadth of the United States Constitution or the importance of traditional tort law to say that they do not address the same concerns.").

Ramos also claims that Dr. Patnaude is liable under § 1983 for failure to train and supervise the nurses at the WCHC. Ramos's Local Rule 56.1 Statements include very few details about the nurses, however, and fail to show that any substandard care that may have been provided by the nurses was accompanied by the requisite state-of-mind of deliberate indifference. For a supervisor to be liable under § 1983, the behavior of his subordinates must result in a constitutional violation. See Whitfield, 431 F.3d at 14; Hegarty, 53 F.3d at 1379–80.

Moreover, there is insufficient evidence to affirmatively link Dr. Patnaude's actions or omissions with any failures of the nursing staff, such that he could be said to have condoned, encouraged, or tacitly authorized their conduct. See Whitfield, 431 F.3d at 14; Hegarty, 53 F.3d at 1379–80. On this point, Ramos cites only the report of Stephen Bolio, Ph.D. ("Bolio"), an expert for several nursing defendants (who have not moved for summary judgment), in which he states that "Dr. Patnaude and the [WCHC] fail to provide nurses with any formal training or routine in-service addressing the clinical issue of safely managing patients who are experiencing drug withdrawal." (Ex. List to Pl. Jesus Ramos's Opp'n to Summ. J. Mot. of Def. Patnaude Ex. Bolio Report 27.) But this cited portion of the report appears in the context of Bolio's explanation for why Ramos's blood was not drawn immediately, and why the nurses were not culpable for the delay. (See id.) The report first explains that Dr. Patnaude's order for the blood test did not specify "STAT" (which would

15

signify that it was to be drawn and sent to the lab immediately), nor "today" (which would signify that it was to be drawn and sent to the lab before the end of the day), and as a result would be considered "routine" (meaning that it would be drawn at the scheduled lab clinic, which in this case meant the next Monday). (Id.) It continues that "LPNs and non advance-practice nurses are prohibited by statute to arbitrarily amend a medical order (including when a lab is to be drawn)." (Id.) Bolio's statement related to Dr. Patnaude's failure to train immediately follows. The report goes on to state that the nursing staff scheduled Ramos for a physical examination with Dr. Patnaude on April 2003, which Ramos refused. (Id.)

Taken in context, Bolio's opinion explains that the nurses were not culpable for defects in care because they were not authorized or trained to take on certain responsibilities, and not necessarily that Dr. Patnaude's training or supervision was inadequate. In any event, evidence of a *constitutional* violation is lacking. If the nurses' actions were limited by their authorization and training, the inference that they acted with deliberately indifference is contradicted. In other words, the only evidence put forth by Ramos to affirmatively link Dr. Patnaude to the nurses' conduct also serves to undercut his claim that an underlying constitutional violation occurred for which Dr. Patnaude is liable.

E.      Worcester Internal Medicine, Inc.

Worcester Internal Medicine, Inc. ("WIM") has moved for summary judgment, arguing that Ramos has no evidence that it had any relationship with Ramos or his medical treatment while he was incarcerated at the WCHC. It is not clear from the summary judgment papers exactly what WIM has to do with anything in this case. Ramos has opposed the motion, but argues only that a private health care provider who contracts with the state to provide medical care to inmates acts under the color of state law. That is an anodyne observation, but state action is, of course, only one of the

16

required elements of a § 1983 claim. On the record presented, WIM is entitled to summary judgment.

## V. Intentional Infliction of Emotion Distress Claims

In addition to his § 1983 claims, Ramos brings claims for intentional infliction of emotional distress ("IIED") against Dr. Patnaude and Correctional Officers Hill and Laramee, each of whom seek summary judgment on this claim. To prevail on an IIED claim, "a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994).

Ramos's Local Rule 56.1 Statements do not even attempt to provide evidence in support of his IIED claim against Hill, and aside from allegations in his amended complaint that cannot be employed to create a fact dispute at summary judgment, see Fed. R. Civ. P. 56(e)(2), Ramos's brief in opposition to the motion for summary judgment only references a snide comment made by Hill, when Ramos was apparently suffering some bleeding, that he (Hill) got more blood out of his face when he shaves. "[M]ere insults, threats, or annoyances" do not constitute extreme and outrageous conduct so as to be actionable under this tort. Sena, 629 N.E.2d at 994.

As to Laramee, Ramos again resorts primarily to the allegations in his amended complaint to argue that his IIED claim can be presented to a jury. The only cognizable evidence cited by Ramos in his brief is Ramos's statement at his deposition that Laramee was responsible for Ramos's discharge from the emergency room. This does not approach the kind of "extreme and outrageous" conduct

17

that is required to sustain an IIED claim, nor does Ramos offer any evidence to support the other elements of an IIED claim.

As to Dr. Patnaude, Ramos opposes his motion summary judgment on the IIED claim, yet cites to no evidence relating to Dr. Patnaude in the section of his opposition brief related to this claim.

The defendants are entitled to summary judgment on Ramos's IIED claims.

## VI.    Failure to Exhaust Administrative Remedies

Although the moving defendants are entitled to summary judgment on the merits of all claims brought against them, there is another reason why Ramos's claims fail. Both federal and state law required Ramos to exhaust his available administrative remedies before bringing his federal and state claims, respectively, and it is undisputed that Ramos did not do so. The Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321–73, as amended, 42 U.S.C. § 1997e(a), states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Massachusetts law has a similar requirement. See Mass. Gen. Laws ch. 127, § 38F ("An inmate shall not file any claim that may be the subject of a grievance under section 38E unless the inmate has exhausted the administrative remedy established pursuant to said section 38E . . . .").

Ramos argues that he should be excused from these requirements because the jail's Inmate Grievance Policy and Inmate Handbook state that "Medical Decisions" cannot be grieved through the administrative process. (See Mem. in Supp. of Defs.' (Flynn, Hill, Laramee) Mot. for Summ. J.

18

on the First Am. Compl. Ex. 4 at 7, 23.)[5] The defendants submit an affidavit from Sergeant Michael Germano, the Sheriff's Office Facility Grievance Coordinator, who draws a distinction between complaints about "Medical Decisions" which cannot be grieved and about "Access to Medical Care," which he says can be grieved. (Id. at 2–3.) It is not disputed that the WCHC's Policy No. 932.04, entitled "Health Care Treatment," (and put into the record by Ramos) states that "inmates may not file grievances related to medical decisions," but that "inmates may file grievances addressing complaints about health services." (Pl.'s Mem. Opposing Defs.' Mot. for Summ. J. on the First Am. Compl. Ex. 14 at 5.) The distinction drawn by Germano suggests that complaints about access to medical care would fall into the grievable category of complaints about health services. Ramos argues, however, that he was never provided with Policy No. 932.04, and so was unaware both of any distinction between complaints about "medical decisions" and complaints about "health services" and about how concrete complaints might be classified.

Since the PLRA requires that a prisoner must exhaust "such administrative remedies as are available," 42 U.S.C. § 1997e(a), Ramos's argument is that a subjective knowledge element should be understood to qualify this phrase, such that a prisoner must exhaust only those administrative remedies *that he knows* are available.

The history of the PLRA and the cases applying it do not support this interpretation, but rather indicate that the PLRA's exhaustion requirement is a relatively rigid one. Prior to the PLRA, the applicable statutory provision did not make exhaustion mandatory, but instead gave courts discretion to require it if it would be "appropriate and in the interests of justice." See 42 U.S.C. §

---

[5] Ramos disputes that this particular exhibit is the handbook that existed in April, 2003, but the handbook which Ramos argues existed at that time includes the exact same statement that medical decisions were not grievable, and accordingly this dispute of fact is immaterial.

19

1997e(a)(1) (1994); Booth v. Churner, 532 U.S. 731, 740 n.5 ( 2001). The PLRA effected a substantial change by making exhaustion mandatory and removing the court's discretion. See 42 U.S.C. § 1997e(a); Porter v. Nussle, 534 U.S. 516, 524 (2002) ("The current exhaustion provision differs markedly from its predecessor. Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory."). The PLRA also removed provisions of the statute that allowed exhaustion to be ordered only when the available remedies were "plain, speedy, and effective...," 42 U.S.C. § 1997e(a)(1) (1994), and when administrative remedies met certain federal standards and were "otherwise fair and effective." Id. § 1997e(a)(2) (1994). These changes, in particular Congress's removal of the discretion previously given to courts, counsel against implying a limitation on the exhaustion requirement that would excuse exhaustion because a prisoner is unaware that administrative remedies are available for his claim. See Booth, 532 U.S. at 741 n.6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."). The PLRA has been interpreted to strongly favor exhaustion, even where it might seem counterintuitive, inequitable, or even pointless. In Booth, the Supreme Court held that administrative remedies are considered "available" under the PLRA, and exhaustion is thus required, even when the *only* relief sought by a prisoner—in that case money damages—cannot even be obtained through the administrative process. 532 U.S. at 734. The Court reasoned that "Congress meant to require procedural exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible." Id. at 739.

The purpose of the PLRA also recommends rejecting Ramos's argument. Congress intended the PLRA's exhaustion requirement to "reduce the quantity and improve the quality of prisoner suits ...." Porter, 534 U.S. at 524–25. Section 1997e(a) serves this purpose by allowing for the possibility of "corrective action taken in response to an inmate's grievance [which] might improve prison

administration and satisfy the inmate, thereby obviating the need for litigation." Id. at 525. It also may filter out frivolous claims and can facilitate the ultimate judicial adjudication by creating an administrative record. Id. These functions would be undermined if a prisoner could bypass the administrative process by remaining ignorant of it. Cf. Booth, 532 U.S. at 740-41 ("Congress's imposition of an obviously broader exhaustion requirement makes it highly implausible that it meant to give prisoners a strong inducement to skip the administrative process simply by limiting prayers for relief to money damages not offered through administrative grievance mechanisms.").

This case presents the circumstance where the inmate might justifiably be uncertain whether a particular matter can be grieved because of an ambiguity in the administrative grievance policy. Whether a grievance involves a "medical decision" and therefore may not be pursued, or whether on the other hand it relates to "health services" and so may be pursued may be unclear. Clarity can be achieved, however, if the inmate utilizes the administrative procedures to present the grievance. If it is rejected because its subject is ungrievable there will have been the exhaustion of remedies that the PLRA demands.

Requiring submission of a grievance of doubtful grievability to the administrative process in the first instance serves a number of purposes. Importantly, it allows the administrators whose rules are at issue to have the first opportunity to interpret them. It is conceivable that the institutional authorities in a given case might even allow the consideration of a grievance that would otherwise seem excluded, such as when a complex of related issues is presented, some grievable under the applicable rules, some not. Requiring exhaustion even in cases where it appears not to be permitted also serves the interest of minimizing the possibility that the inmate could attempt a civil action only to have it rejected by the court because of the court's view about grievability, which view might well have been reached without satisfactory guidance from the institutional authorities, so that the inmate

21

would have to go back to the administrative process and then, depending on the outcome, possibly return to court. And, as the Court noted in Porter, the presentation of a grievance that is strictly speaking not grievable my nonetheless result in an informal adjustment of the complaint.

Since Ramos did not attempt administration exhaustion of his claims, his § 1983 claims are subject to dismissal.

There is no relevant Massachusetts law concerning this point regarding the parallel state requirement, but the reasons that counsel dismissal of the federal claims would apply as well in the case of the state claims, and they should similarly be subject to dismissal for failure to exhaust.

## VII. Ramos's 56(f) Request

Ramos attempts to forestall summary judgment on his claims by seeking to conduct additional discovery pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. The rule provides, in relevant part, that "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may...order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken...." Fed. R. Civ. P. 56(f). "[T]he prophylaxis of Rule 56(f) is not available merely for the asking. A litigant who seeks to invoke the rule must act with due diligence to show that his predicament fits within its confines. To that end, the litigant must submit to the trial court an affidavit or other authoritative document showing (i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to the defeat the pending summary judgment motion." Rivera-Torres v. Rey-Hernandez, 502 F.3d 7, 10 (1st Cir. 2007). Ramos's Rule 56(f) requests are therefore denied.

22

## VIII.  Conclusion

For the foregoing reasons, the moving defendants are entitled to summary judgment on all claims against them in the amended complaint. The defendants' several motions for summary judgment (dkt. nos. 76, 89, and 92) are GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge